IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-3096

WARREN BIRCHER, SR.,

Plaintiff, Appellant,

v.

JAMES A. PIERCE and SCOTT KROFCHEK,

Defendants, Appellees.

APPELLANT'S BRIEF

On Appeal from an Memorandum Opinion and Order of Court
of the United States District Court for the
Western District of Pennsylvania, Civil Action No. 12-0528
dated June 20, 2014, granting dismissal.

COUNSEL FOR APPELLANT

Joel S. Sansone, Esquire
LAW OFFICES OF JOEL SANSONE
Three Gateway Center, Suite 1700
401 Liberty Avenue
Pittsburgh, Pennsylvania 15222
412.281.9194

## TABLE OF CONTENTS

TABLE OF CASES, STATUTES AND AUTHORITIES . . . . . . . . . .   ii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW . . . . . .   2

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . .   3

CONCISE STATEMENT OF THE CASE . . . . . . . . . . . . . . .   4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . .  13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

CERTIFICATE OF CONSEL

JOINT APPENDIX

    Notice of Appeal                                      RR 1
    Memorandum Order and Opinion of the Trial Court        RR 2
    Docket Entries                                        RR 12
    Complaint in a Civil Action                           RR 19

CERTIFICATE OF SERVICE

i

## TABLE OF CASES, STATUTES AND AUTHORITIES

| CASES | PAGE |
|---|---|
| *Wilson v. Russo*, 212 F.3d 781 (3rd Cir. 2000). | 14 |
| *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999). | 15 |
| *Bigford v. Taylor*, 834 F.2d 1213 (5th Cir. 1988). | 15 |
| *Merkle v. Upper Dublin School District*, 211 F.3d 782 (3rd Cir. 2000). | 3, 15 |
| *Illinois v. Gates*, 462 U.S. 213 (1983). | 15 |
| *Montgomery v. DeSimone*, 159 F.3d 120 (3rd Cir. 1998). | 16 |
| *Sharrar v. Felsing*, 128 F.3d 810 (3rd Cir. 1997). | 3, 16 |
| *Deary v. Three Unnamed Police Officers*, 746 F.2d 185 (3rd Cir. 1984). | 16 |
| *Patzig v. O'Neil*, 577 F.2d 841 (3rd Cir. 1978). | 16 |
| *Moore v. Comesanas*, 32 F.3d 670 (2nd Cir. 1994). | 16 |
| *Rader v. City of Pittsburgh*, 2013 U.S. Dist. LEXIS 39706 (W.D.Pa. 2013) | 17 |
| *Lee v. Mihalich*, 1987 U.S. Dist. LEXIS 4600 (E.D.Pa. 1987). | 17 |
| *U.S. v. Woolbright*, 831 F.2d 1390 (8th Cir. 1987). | 17 |

| STATUTES | PAGE |
|---|---|
| 28 U.S.C. Section 1331 | 1 |
| 42 U.S.C. Section 1983 | 1 |
| 28 U.S.C. Section 1291 | 1 |
| Federal Rule of Appellate Procedure 4(a)(1)(A) | 1 |

## JURISDICTIONAL STATEMENT

The United States District Court for the Western District of Pennsylvania has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as the underlying dispute arises under out of the Constitution, laws and/or treaties of the United States, namely, 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.    Appellant, Warren Ernest Bircher, Sr., has alleged that Appellees, Pennsylvania State Troopers James Pierce and Scott Krofchek, acting under color of law as Pennsylvania State Troopers, violated his Fourth Amendment rights by maliciously prosecuting him, and in doing so, violated 42. U.S.C. § 1983.

The United States Court of Appeals for the Third Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 as it is an appeal from a Final Order of the District Court, namely, the District Court's June 20, 2014 Order granting Appellees' Motion for Summary Judgment and thereby dismissing all of Appellant's claims for relief.

Appellant timely filed a Notice of Appeal on June 23, 2014, within the thirty (30) day appeal period set forth by Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the United States District Court for the Western District of Pennsylvania erred in granting Appellees' Motion for Summary Judgment although Mr. Bircher had alleged specific violations of his constitutional right to be free from malicious prosecution, and moreover, Mr. Bircher alleged numerous facts supporting his claim that Appellees omitted material exculpatory information from the Affidavit of Probable Cause and included inculpatory information that objectively lacked credibility and/or believability. (See, Plaintiff's Brief in Opposition to Troopers' Motion for Summary Judgment).

Specifically, the District Court erred when it (1) usurped the fact-finder's role and concluded that Appellees had probable cause to arrest and prosecute Mr. Bircher, despite well-established appellate case law holding that the probable cause determination is to be made by the jury, not the Court; and (2) viewed the alleged facts and evidence in a light most favorable to the moving party, the Appellees, as opposed to the non-moving party, Mr. Bircher, which is contrary to the well-established standard for ruling on a Motion for Summary Judgment.

## STATEMENT OF RELATED CASES

Appellant is not aware of any cases related to the action that is the subject of this appeal.

## STATEMENT OF THE STANDARD OR SCOPE OF REVIEW

"This court's review of the district court's order granting summary judgment in favor of the Troopers is plenary." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). The Court of Appeals applies the same test as the District Court should use in the first instance, to determine if there are any issues of material fact which would allow the issue to go to trial. *Sharrar v. Felsing*, 128 F.3d 810, 817 (3d Cir. 1997). Appellant, as the non-moving party, is entitled to every favorable inference that can be drawn from the record. *Id.*

## CONCISE STATEMENT OF THE CASE

### a.    Introduction

The above-captioned action arises out of the State Troopers' wrongful arrest and malicious prosecution of Warren Ernest Bircher, Sr., related to the death of "Baby Mary", a newborn baby that was found dead in Cove Run Creek in Uniontown, Pennsylvania. (RR19-32). Mr. Bircher was charged with the murder of Baby Mary eight and one-half years after the baby was found in the creek. (*Id*).

In considering the underlying criminal investigation, prosecution and subsequent civil rights lawsuit, it should be noted that Mr. Bircher, the Troopers and the District Court unanimously agree that the subject arrest and prosecution were based solely on evidence obtained from two witnesses – Sara Hawk (the mother of Baby Mary) and Timothy Reckner (a jailhouse informant). (RR5). Further, the District Court opined that it agreed with Mr. Bircher that pertinent information was omitted from the Affidavit of Probable Cause. (RR9). The District Court concluded, however, that despite omitting important evidence – namely the various and inconsistent statements of Ms. Hawk – the statement from Mr. Reckner standing alone was sufficient to find that there was probable cause to arrest and prosecute Mr. Bircher. (RR9-10).

### b.    Investigation

On June 4, 2000, two individuals found a backpack in a creek, and upon opening it discovered that it contained a deceased newborn baby wrapped in plastic bags and a 2XL men's flannel shirt. (RR75-76). The Pennsylvania State Police investigation of Baby Mary's death continued on-again-off-again over approximately an eight (8) year period. Defendant Pierce voluntarily overtook the investigation of Baby Mary's death in January 2007 and was assisted throughout by Defendant Krofchek. (RR77).

Ultimately, on January 21, 2009, The Troopers arrested Mr. Bircher and charged him with the murder of Baby Mary. (RR90). The Troopers' arrest and prosecution of Mr. Bircher was allegedly based on information obtained from two (2) separate witnesses, Timothy Reckner and Sara Hawk. (RR33-36).

### c.    Timothy Reckner's Statement

Mr. Reckner was a jailhouse informant incarcerated in Fayette County Prison during the time he allegedly provided the Troopers with information about the Baby Mary case. (RR78). In June 2008, the Troopers allegedly approached Mr. Reckner because he "resided in Lemont Furnace in 2000 and abused drugs[.]" (RR78). The Affidavit of Probable Cause omitted why Mr. Reckner and the Troopers had reason to interact, i.e. that he was randomly

5

approached regarding this unsolved crime because he lived in the area and used drugs. (RR33-36).[1]

The Troopers aver that Mr. Reckner told them that he was at a local hangout spot in 2000, shortly before the death of Baby Mary, and Mr. Bircher approached him and told him that he was planning on drowning a then-yet-born child. (RR78-79). The Affidavit of Probable Cause omitted that Mr. Bircher denied ever being at that location and that Mr. Bircher did not know Mr. Reckner. (RR33-36). The Troopers further contend that Mr. Reckner stated that Mr. Bircher told him that a Rhonda Duritsky, who was also allegedly present at the party spot, was pregnant and Mr. Bircher was the father. (RR78-79). The Affidavit of Probable Cause omitted the facts that Mr. Reckner did not know Ms. Duritsky, Ms. Duritsky was later proved to not be the mother, Mr. Bircher was later proved to not be the father, and Ms. Duritsky lived in Virginia all of 2000 and never once set foot in Pennsylvania during 2000. (RR33-36, 100). The Troopers aver that Mr. Reckner was shown photographs of Mr. Bircher and Ms. Duritsky, and that Reckner was able to confirm that they were the two individuals at the local hangout spot in 2000. (RR79). There has yet to be an explanation as to why Defendant Pierce

---

[1] It is undisputed that there is no evidence in the record linking the death with drugs or drug activity in any way.

was carrying a photograph of Mr. Bircher when he went to see Mr. Reckner, when at no point in the entire investigation had anyone mentioned Mr. Bircher as a suspect or witness in the Baby Mary case.

Mr. Reckner's information was inherently unreliable and untrustworthy. He implicated the two individuals whose photographs he was shown – Mr. Bircher and Ms. Duritsky – and yet it was later conclusively determined that (1) Ms. Duritsky was not the mother of Baby Mary, (2) Mr. Bircher was not the father of Baby Mary, (3) Mr. Bircher and Ms. Duritsky did not know or ever interact with each other, and (4) Ms. Duritsky had never set foot in Pennsylvania during 2000, the year this encounter allegedly occurred. (RR81, 100). Further, both Mr. Reckner and Mr. Bircher agree that they do not know each other, are neither friends nor acquaintances, and have had no previously interactions. (RR78-79, 94). When asked about the objective reliability of questioning a jail inmate who just happened to have the key information to solve a nearly decade long mystery, Trooper Pierce stated that such a fluke is "possible", although not probable. (RR98A). Trooper Pierce actually testified that this lucky break was a good coincidence. (RR98).

Prior to charging Mr. Bircher, the Troopers also secured recorded telephone calls Mr. Reckner made from Fayette County Prison during the time he was assisting the Troopers in the Baby Mary investigation. (RR37-50). The

7

transcripts of those telephone calls reflect that, contrary to Trooper Pierce's deposition testimony, Mr. Reckner repeatedly stated that he had demanded release from prison in exchange for his testimony. (RR37-50). In fact, Mr. Reckner went as far as stating with respect to Trooper Pierce: "I already told him, I says (sic) I don't even know what was said at that party...if he wants me to write that down in a statement, I will, if he gets me out of here first. Make a deal. I'm not going to be his sucker." (RR38).

The recorded prison telephone calls are particularly relevant to a probable cause determination, specifically, whether Mr. Reckner's testimony was sufficiently reliable to serve as the basis for an arrest. Mr. Reckner frequently states in the telephone calls that the Troopers are threatening him if he does not cooperate and testify that Mr. Bircher was involved. (RR37-50). At no time in any of the telephone calls does Mr. Reckner actually implicate Mr. Bircher.

### d.    Sara Hawk's Statements

Subsequent to obtaining a statement from Mr. Reckner, Troopers Pierce and Krofchek received DNA test results that confirmed the mother of Baby Mary was one of the Hawk sisters. (RR81). The Troopers, through additional DNA testing, were able to determine that the mother of Baby Mary was Sara Hawk, the younger sister of Mr. Bircher's wife. (RR82).

8

On November 21, 2008, Ms. Hawk was arrested and interrogated extensively by Trooper Pierce, without having secured legal representation. (RR83-84). Ms. Hawk was uncontrollably sobbing during the interrogation and provided a detailed description of her pregnancy, labor and birthing of Baby Mary, and her subsequent actions that killed Baby Mary. (RR83-84). Ms. Hawk's description was so detailed, including reference to an initial belief that the placenta was a second baby, that it was inherently reliable.[2] At no point during this interrogation and confession did Ms. Hawk implicate or mention Mr. Bircher, but instead stated that she gave birth in her her parents' trailer. (RR83-84). Moreover, she provided information that Hyson Ford, a black teenager, was the father of Baby Mary. (RR84). Mr. Ford's paternity was later confirmed by DNA testing. (RR90) Mr. Ford was interviewed by the Troopers on November 24, 2008, and confirmed that he was the father of Baby Mary, but Ms. Hawk's parents would not let him see her because they did not approve of interracial relationships. (RR85). The Magistrate was never informed that Mr. Ford told the parents about the pregnancy and that he was the father. (RR33-36, 85). Nor was the Magistrate told that the parents were aware that Ms. Hawk was pregnant, but never contacted the authorities at any

---

[2] In her first of four different statements, eight years earlier, Ms. Hawk denied any knowledge of or participation in the pregnancy or the murder. (RR33-36).

point in the eight and one half years after the baby was found, despite their daughter being pregnant and then no longer being pregnant.

After her arrest and statement, Ms. Hawk then secured counsel to represent her with respect to any charges arising out of the death of Baby Mary. (RR85). Trooper Pierce conducted another interview of Ms. Hawk with her counsel present. (RR86). Ms. Hawk changed various parts of her original story, most importantly, implicating Mr. Bircher in assisting in the birth of Baby Mary. (RR86-87). Ms. Hawk still maintained, however, that her and Mr. Bircher had never had sexual intercourse and she was the one that placed Baby Mary in the creek. (RR86-87).

Inexplicably, Trooper Pierce then provided Ms. Hawk and her counsel with a written statement provided by Mr. Reckner, wherein Mr. Reckner stated that Mr. Bircher was going to murder the yet-to-be-born baby because he feared that he might be the father. (RR88). Upon receiving this statement, Ms. Hawk immediately gave another statement where, for the first time in four different statements, she alleged that she and Mr. Bircher had previously had sexual intercourse and that is why he assisted in delivering and murdering Baby Mary. (RR89-90). This final statement resulted in Ms. Hawk receiving a plea bargain in exchange for her testimony against Mr. Bircher.

The Affidavit of Probable Cause failed to reference the various statements of Ms. Hawk, and in fact, only referenced the final statement. (RR33-36). The District Court held that the conflicting and changing statements given by Ms. Hawk, which were left out of the affidavit, were things that a judge would want to know. (RR9).

### e.    Affidavit of Probable Cause

The Affidavit of Probable Cause was deficient, as detailed above, in that it failed to include all exculpatory evidence and included objectively unreasonable and/or unbelievable "inculpatory" evidence. The Affidavit failed to note that Mr. Reckner was approached not because he informed the Troopers that he had information on the case, but rather on the inherently unreliable (and irrelevant) basis that he was a drug user in the town. (RR78). The Affidavit did not provide any other key information regarding Mr. Reckner's statement, such as (1) he was wrong about the mother, (2) he was wrong about the father, (3) he was wrong about who was at the hangout spot on the alleged occasion, and (4) that Mr. Reckner did not know Mr. Bircher other than this chance encounter. Perhaps most importantly, the Affidavit did not inform the Magistrate that Mr. Reckner repeatedly complained of coercion and intimidation by the Troopers, and that he sought a plea deal in exchange for providing this information. In fact, Mr. Reckner went so far as intimating

that he would pin the murder on whomever the Troopers wanted in return for a deal.

As indicated above, the Affidavit was silent as to Ms. Hawk's multiple contradictory statements. Those various statements should have been included, explained and/or referenced in the Affidavit of Probable Cause, as they cannot be assessed in a vacuum. These statements should have been included independent of any weight given to Mr. Reckner's statement, as the initial statement by Ms. Hawk is exculpatory evidence. Mr. Bircher's alleged co-conspirator in murder told the Troopers, without counsel present, that she performed this act by herself, at her residence, and explained step-by-step how it occurred and how she disposed of Baby Mary.

These are the record facts which give rise to the claim that the Affidavit of Probable Cause was constitutionally deficient, because it was one sided against Mr. Bircher, and because it relied for its basis on the contrived testimony of a coerced inmate desperate for release.

## SUMMARY OF THE ARGUMENT

Troopers Pierce and Krofchek withheld evidence from the Affidavit of Probable Cause that a Magistrate would surely want to know. The Affidavit contains no reference to the fact that the mother, Ms. Hawk, made four very different statements to the Troopers. It contains no reference to the fact that she did not implicate Mr. Bircher in any way until she was fed information from another witness who allegedly implicated Mr. Bircher.

The Affidavit is silent as to the highly questionable conduct of the Troopers in coincidentally "finding" this perfect witness on the first try, using irrelevant criteria eight years later to search for him. The Troopers obtained the statement of that witness through intimidation and coercion, although that information is missing from their Affidavit. Nowhere does the Affidavit recount that the witness got all of the information wrong, including the identity of the mother. Eight years after the fact, after being shown a picture that the Troopers brought with them before ever meeting the witness, he identified the woman as the mother of the dead child, even though that woman had not set foot in Pennsylvania during the subject period. The key witnesses to support probable cause were wildly incredible, and gave coerced and/or contrived evidence.

13

## ARGUMENT

### a.    The Legal Standard

> (O)missions are made with reckless disregard if an officer
> withholds a fact in his ken that "any reasonable person would
> have known that this was the kind of thing the judge would
> wish to know.

*Wilson v. Russo,* 212 F.3d 781, 787 (3rd Cir. 2000).

In *Wilson*, this Court provided a measuring stick for evaluating a police

officer's omissions, described above.   *Wilson* gave further definition to the

phrase "reckless disregard for the truth" when examining an assertion made

by a would-be arresting officer:

> An assertion is made with reckless disregard when "viewing all
> the evidence, the affiant must have entertained serious doubts
> as the truth of his statements, or had obvious reasons to doubt
> the accuracy of the information he reported."

212 F.3d at 788.

The *Wilson* opinion summarized the duty of a police officer attempting

to determine if probable cause to arrest exists in the face of a victim's claimed

identification of the perpetrator:

> While we agree that a positive identification by a victim
> witness, ***without more***, would ***usually*** be sufficient to establish
> probable cause, this qualified precept cannot be rendered
> absolute. ***Independent exculpatory evidence*** or ***substantial***
> ***evidence of the witness's own unreliability that is known by***
> ***the arresting officer could outweigh the identification*** such
> that **probable cause would not exist**. (Emphasis added).

*Id. at* 790.

In the subject case, the District Court agreed with Mr. Bircher that the Troopers omitted evidence that a judge would want to know when weighing the Affidavit of Probable Cause (i.e. the multiple and conflicting Hawk statements). (RR9)  The District Court erred, however, in concluding that, despite these omissions, Mr. Reckner's statement alone was sufficient for a finding of probable cause.  This is expressly contrary to Third Circuit precedent in *Wilson* where the Court held:

> An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.

*Id.,* citing *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir. 1999).  *Accord, Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir. 1988).

Simply put, even if Mr. Reckner's statement was, in fact, reliable and substantially inculpatory, the Troopers were still required to include the multiple Ms. Hawk statements so that a proper probable cause finding could be made.  The failure to do so is a clear violation of *Wilson.*

A determination of probable cause requires the officer to apply a "common sense approach" to the probable cause analysis, and to examine the "totality of the circumstances" when making such a finding. *Merkle v. Upper*

*Id. at* 790.

In the subject case, the District Court agreed with Mr. Bircher that the Troopers omitted evidence that a judge would want to know when weighing the Affidavit of Probable Cause (i.e. the multiple and conflicting Hawk statements). (RR9). The District Court erred, however, in concluding that, despite these omissions, Mr. Reckner's statement alone was sufficient for a finding of probable cause. This is expressly contrary to Third Circuit precedent in *Wilson* where the Court held:

> An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.

*Id.,* citing *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir. 1999). *Accord, Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir. 1988).

Simply put, even if Mr. Reckner's statement was, in fact, reliable and substantially inculpatory, the Troopers were still required to include the multiple Ms. Hawk statements so that a proper probable cause finding could be made. The failure to do so is a clear violation of *Wilson.*

A determination of probable cause requires the officer to apply a "common sense approach" to the probable cause analysis, and to examine the "totality of the circumstances" when making such a finding. *Merkle v. Upper*

*Dublin School District,* 211 F.3d 782, 788-89 (3d Cir. 2000), citing *Illinois v. Gates,* 462 U.S. 213 (1983).    A jury should be presented with both Mr. Reckner's and Ms. Hawk's statements and so that it could reach its own conclusion as to whether a Magistrate would have found that probable cause existed.

> Generally, the question of probable cause in a section 1983 damage suit *is one for the jury* . . .(Internal citations omitted) *This is particularly true where the probable cause determination rests on <u>credibility conflicts.</u>*" (Emphasis Added).

*(Id.) Accord, Montgomery v. De Simone,* 159 F.3d 120, 124 (3d Cir. 1998)(Summary judgment not appropriate unless a jury "could not find lack of probable cause); *Sharrar v. Felsing,* 128 F.3d 810, 818 (3d Cir. 1997)(Summary judgment only appropriate if "credibility conflicts are absent."); *Deary v. Three Unnamed Police Officers,* 746 F.2d 185, 192 (3d Cir. 1984)[Probable cause a question for the jury]; *Patzig v. O'Neil,* 577 F.2d 841, 848 (3rd Cir. 1978); *Moore v. Comesanas,* 32 F.3d 670, 673 (2nd Cir. 1994)(Issue of probable cause is predominantly factual in nature and properly presented to a jury).

In *Rader v. City of Pittsburgh,* 2013 U.S. Dist. LEXIS 39706 (W.D.Pa. 2013), Judge Cercone of the Western District relied on *Wilson, supra,* to conclude that:

> Careful application of these principles ensures that a police officer does not make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.

*Rader, supra,* at *21, citing *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir. 1999). In so holding, the *Rader* Court repeated that an officer contemplating an arrest is not free to disregard plainly exculpatory evidence. *Id. See, also, Lee v. Mihalich,* 1987 U.S. Dist. LEXIS 4600, *3-*4 (E.D. Pa. 1987)[When reasonable minds could differ as to the existence of probable cause to prosecute, then the issue is one for the jury].

## b.    Applying the Case Law to the Facts at Bar

As detailed above, the alleged support for probable cause in this case has as its underpinnings two witnesses: namely, Sarah Hawk and Timothy Reckner. Without these two "witnesses", the Troopers have absolutely no argument supporting probable cause.

Because of the flaws in the evidence from both of those witnesses, the use of that evidence to support an arrest warrant for Mr. Bircher showed a reckless disregard for the truth by the Troopers. (See, *Wilson, supra*, 212 F.3d at 788). The "evidence" presented by these two witnesses must have caused both experienced Troopers to "have entertained serious doubts" as to the truth of that evidence. More importantly, the Troopers had a duty to include

in the Affidavit of Probable Cause (1) exculpatory evidence and (2) evidence that would cast doubt on the believability and/or credibility of the "inculpatory" evidence.

### (1.) The Credibility of Sarah Hawk

Turning first to the claims made by Ms. Hawk, the Troopers should have entertained serious doubts about the truth of her claims, no matter which one of her four statements was being considered. There is no question, based upon the undisputed evidence that Ms. Hawk lied to the Troopers on at least three occasions. She either lied when she said she had nothing to do with it, or when she said she did it herself, or when she said Mr. Bircher did it, or when she said Mr. Bircher had sex with her and did it. The fact that Ms. Hawk gave four different statements should be enough to introduce serious doubts into the minds of these Troopers. It should be enough for the jury to determine whether the Troopers should have had reason to doubt the accuracy of her statements.

At the very least, and as opined by the District Court, the Magistrate Judge should have been told that Ms. Hawk's inculpatory statements with respect to Mr. Bircher, came after she was given a copy of Mr. Reckner's statement supposedly implicating Mr. Bircher. Prior to Ms. Hawk receiving

this information, Ms. Hawk never identified anyone but herself as being involved in this crime.

Of particular interest to the Troopers, and thus the Magistrate, should have been the fact that, in her **second statement**, Ms. Hawk gave a fairly detailed description of the birth process and her role in it. Her account included a description of the afterbirth and other details which were inherently believable, all given without the assistance of counsel. This is contrasted with her **third** and **fourth statements** in which she claimed that Mr. Bircher delivered the baby and that she could see very little of what was occurring and could not provide nearly as much detail regarding the birth and murder of Baby Mary as she did in her second statement.

What is clearly true is that the Troopers had facts within their "ken" which were "the kind of thing the judge would wish to know." Any judge would wish to know that the chief accuser of Mr. Bircher lied on at least three separate occasions about this incident, and about him, and gave four different accounts about what happened. *Wilson, supra,* 212 F.3d at 787.

Finally, the Magistrate should have been told of the motive for Ms. Hawk giving evidence against Mr. Bircher. In exchange for implicating him, Ms. Hawk entered into a plea agreement with the district attorney in which she agreed to give testimony and evidence against Mr. Bircher and in turn avoided

19

a first-degree murder charge. (RR51-74). This is the first of numerous credibility conflicts that were ignored by the Troopers, evidencing their reckless disregard for the truth in this case.

*(2.) The Invented Evidence*

The following evidence, if accepted by the fact finder, will clearly demonstrate that the Troopers targeted Mr. Bircher for this crime without prior evidence or good reason. The evidence, when viewed in a light most favorable to Mr. Bircher, shows that the Troopers created, or at the very least relied upon doubtful evidence that was fed to Ms. Hawk immediately prior to her changing her story.

The first issue is Trooper Pierce's excuse for questioning Mr. Reckner regarding this case. Trooper Pierce allegedly questioned Mr. Reckner because he "lived in that area and was known to abuse drugs." There is no evidence of any kind that drug abuse was a factor in the killing of Baby Mary. Moreover, a witness' drug use should be a factor considered in disregarding the witness' information, not a reason to seek embrace it. From the outset, Mr. Reckner's information should have been viewed skeptically.

Further, a Magistrate would have asked why Trooper Pierce used Mr. Bircher's name to obtain a search warrant for DNA evidence from his ex-wife. As the facts show, Trooper Pierce sought DNA evidence from Kristie Bircher

prior to meeting with Mr. Reckner. The basis for seeking this DNA evidence from Kristie Bircher, as set forth in Trooper Pierce's Affidavit of Probable Cause, was that Kristie Bircher was "the wife of Warren Bircher." At the time that this warrant was sought, Mr. Bircher was not a suspect in the case and had never been mentioned by anyone. Therefore, using as a basis for probable cause that Kristie Hawk was the wife of Mr. Bircher should not have been relevant in any way. This raises doubts as to the Troopers' claim that they approached a jailhouse informant to inquire about an eight year old murder investigation, and that this informant happened to know who murdered Baby Mary. It would have been the luckiest coincidence in any investigating officer's career, and immediately casts doubt on the reliability of the information and the manner in which it was obtained. The Magistrate should have had this evidence.

The evidence, viewed in a light most favorable to Mr. Bircher, suggests that the Troopers put words into Mr. Reckner's mouth. Mr. Reckner clearly stated that he did not remember Mr. Bircher's alleged inculpatory statements made at the local hangout spot, and that the Troopers were trying to force Mr. Reckner into saying that he did:

> I already told him, I says (sic) I don't even know what
> was said at that party . . . if he wants me to write that
> down in a statement, I will, if he gets me out of here first.

21

Make a deal. I'm not gonna be his sucker.

(RR37).

It is clear from the context of the transcript that "he" in the above statement refers to Trooper Pierce. (*Id.*)

Mr. Reckner's statements are further suspect because he identified the woman, Rhonda Duritsky, who was the subject of his statements from a photograph already in Trooper Pierce's possession. Notably, Mr. Reckner **identified the wrong person as the potential mother of the murdered child.** Had Trooper Pierce done any serious investigation, he would have known that Ms. Duritsky was not even in Pennsylvania at the time of the incident in question.

Because of these facts, there is serious question as to whether Mr. Reckner ever implicated Mr. Bircher in any way.[3] Certainly the Magistrate would have liked to have this information.

The Affidavit of Probable Cause should have also pointed out that Mr. Reckner would only implicate Mr. Bircher if he was promised a deal. The record demonstrates the multiple times in two telephone conversations when Mr. Reckner made it clear that he would give the Troopers what they wanted

---

[3] Among the numerous telephone calls by Mr. Reckner from prison, all produced by the defense, including the two that have been analyzed, Mr. Reckner never mentions the Plaintiff's name at any time.

in exchange for his freedom, and that he would give them nothing if they could not guarantee that freedom. The Magistrate would have questioned the believability of a witness that would only come forward to cooperate in a murder case if he was released from jail.

The Magistrate would also likely ask why the Troopers threatened Mr. Reckner that if he did not give them the information they sought, they would return and forcibly take his DNA, and force a lie detector test to determine whether or not he was the father and whether he was the murderer. (RR37-50). These tactics of intimidation and coercion should create a jury question as to whether or not these Troopers had "obvious reason to doubt the accuracy of the information" supposedly reported by Mr. Reckner. *Wilson, supra*, 212 F.3d at 788.

What is abundantly clear is that the information tainting Mr. Reckner's statements (if he even made them) was information that the Magistrate Judge should have been given in an Affidavit of Probable Cause prepared by the Troopers. In this case, there is no information in the Affidavit that throws any doubt upon the information supposedly provided by Mr. Reckner. A jury should be asked to determine whether or not the use of threats and intimidation against a prisoner in order to obtain allegedly damaging evidence is the proper method by which to determine and establish probable cause.

### (3.)    *The Ignored Evidence*

The record is full of evidence that was ignored by Troopers Pierce and Krofchek in concluding that Mr. Bircher probably committed this crime. This Court has required that police officers examine "the totality of the circumstances" when trying to determine probable cause. *Merkle, supra,* 211 F.3d at 788-89. Here, the Troopers did not fulfill their duty to "conduct a reasonably thorough investigation prior to arresting" Mr. Bircher. *Kuehle, supra*, 173 F.3d at 650. Clearly, these Troopers failed to advise the Magistrate of the evidence which existed demonstrating that they failed to further investigate.

The evidence regarding Robert and Debra Hawk (Sarah Hawk's parents) presents the most damning example of the failure of the Troopers to reasonably investigate information which was right in front of them. After the **second statement** by Ms. Hawk, they knew that she claimed to have given birth in a trailer owned by her parents in the middle of the night. Neither Robert nor Debra Hawk were asked a series of questions that virtually anyone, much less a trained investigator, would have thought to ask. Neither parent was questioned about whether or not they knew that their daughter was pregnant, or that she gave birth in their small trailer while they all slept nearby. Ms. Hawk's mother was never asked if she assisted in this birth, knew

that her daughter gave birth, or noticed that she was no longer pregnant. All of this despite the fact that Hyson Ford told the Troopers he knew he was the father and had called Ms. Hawk's parents and told them so months before Baby Mary's birth. The Troopers also knew that Ms. Hawk's father was an avowed racist who had made remarks about the undesirability of biracial children in the past. There was no questioning of either parent about how they felt about having a biracial grandchild, or what actions they may have taken when they learned that their daughter was pregnant with a biracial child.

Most damning to be sure is the failure of the Troopers to inquire of Robert Hawk as to why his shirt was wrapped around Baby Mary when she was discovered in the creek. Trooper Pierce's testimony in his deposition on this subject is very confusing. Initially, when asked if there was any evidence to suggest that either Robert or Debra Hawk had a motive to be engaged in this crime, Trooper Pierce said that there was no observable motive. When questioned further, he acknowledged the possibility that these parents, with their racial bias, and with the physical evidence and statements by their daughter to consider, may have in fact had a motive to engage in this crime. (RR97).

The Magistrate was never informed that these issues were not fully investigated. A jury should decide whether or not the Judge would have wanted to know what the answers to the questions were regarding Robert and Debra Hawk's knowledge of, and participation in this crime. Unfortunately, the Affidavit of Probable Cause in this matter is silent on these issues.

### c.   District Court's Opinion

The District Court's opinion fails to address any of these issues. The District Court's Opinion, it is respectfully urged, ignores the law from this Circuit, improperly engages in fact finding, and fails to take evidence in a light most favorable to Mr. Bircher. This Court has held that: "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence even if substantial inculpatory evidence standing by itself suggests that probable cause exists." *Wilson, supra,* 212 F.3d at 790. Unfortunately, the District Court ignored the pertinent portions of this Court's ruling in *Wilson.*

The District Court opines that Mr. Reckner's statement standing alone is sufficient for a finding of probable cause. (RR10). This Court in *Wilson* said that a positive identification by a witness can be outweighed by evidence of that witness' unreliability known to the arresting officer. Under those circumstances, this Court has held that probable cause would not exist. (*Id.*)

26

A reading of the District Court's Opinion suggests that the District Court did not apply that portion of the *Wilson* holding to these facts.

Furthermore, the District Court ignored the evidence, taken in a light most favorable to Mr. Bircher, that Mr. Reckner's statement was not a tip "offered" by him, but rather a statement forced from him through coercion and intimidation.   Moreover, the District Court found that "Reckner's statements were corroborated by the location of Baby Mary's body." (*Id.*)  The District Court does not explain this statement, nor is there any evidence in Mr. Reckner's statement that corroborates anything about the location of Baby Mary.

Finally, the District Court held that "the Plaintiff offers no viable evidence that Troopers made false statements or critical omissions related to Reckner's statements." (*Id.*)  This is an absolutely inaccurate characterization of Mr. Bircher's position at summary judgment.  Mr. Bircher's brief and record are replete with reasons why Mr. Reckner's statement lacked credibility. Those reasons have been restated herein and were part of the original Brief in Opposition.  In its very short opinion, in a long footnote, which is the most substantive comment in the Opinion, the District Court found "as a matter of law", that Mr. Bircher's arguments regarding Mr. Reckner's statement were "pure speculation and conjecture," and had "no merit." (RR10) This is

completely inaccurate, as the arguments against Mr. Reckner's credibility are repeatedly cited to the record (i.e., Investigation Report, jailhouse call transcripts, deposition testimony, etc.).

The District Court erred in its application of the law and its view of the disputed evidence. Viewing Mr. Reckner's statement in the light most favorable to Mr. Bircher would have demonstrated that Mr. Reckner was being coerced and forced into lying about Mr. Bircher. Above all, the District Court should have concluded that Mr. Reckner's statement should have been considered in conjunction with the multiple statements from Ms. Hawk. If a Magistrate had an opportunity to review all of the evidence, he or she then could have made an informed opinion about whether probable cause existed. Presenting only inculpatory evidence violated Mr. Bircher's civil rights, and blatantly violated the standard set forth in *Wilson*.

## CONCLUSION

In *Wilson* the Third Circuit set forth the exact standard governing what must be included in an Affidavit of Probable Cause. The Court held that all exculpatory evidence must be included, regardless of whether there is inculpatory evidence which standing by itself would likely establish probable cause. That standard was clearly not met by the Troopers in this case, and therefore the District Court erred in granting summary judgment.

Further, the issue of a police officer's duty when determining whether or not probable cause exists, and how much investigation is necessary, requires a bright line test. These facts, post *Wilson,* give this Court the opportunity to expand the duty of an officer and require, as a matter of commons sense, more than was done here. Mr. Bircher urges the Court to adopt a test, like the other Circuit Courts cited herein, which will not unduly burden the police, but yet require them to investigate those suspects or leads that are readily available and apparent. This duty is required in order to protect and preserve the fundamental liberties guaranteed to Mr. Bircher, and all citizens, through the Fourth Amendment.

Respectfully submitted,

LAW OFFICES OF JOEL SANSONE

/s/ Joel S. Sansone
Joel S. Sansone, Esquire
PA ID No. 41008
Attorney for the Plaintiff
Suite 1700, Three Gateway Center
401 Liberty Avenue
Pittsburgh, Pennsylvania  15222
(412) 281-9194


WAYMAN, IRVIN & McAULEY, LLC

/s/ Jonathan M. Gesk
Jonathan M. Gesk, Esquire
PA ID No. 205678
Attorney for Plaintiff
Suite 1700, Three Gateway Center
401 Liberty Avenue
Pittsburgh, PA  15222
(412) 566-2970

Dated:  September 2, 2014

## CERTIFICATE OF COUNSEL

I hereby certify as follows:

1.      That I am a member of the bar of this Court.

2.      That the text of the electronic version of this brief is identical to the text of the paper copies.

3.      That the following virus protection detection program, Symantec, was run on the file and no virus was detected.

4.      That this brief contains 6182 words within the meaning of Fed.R.App.Proc. 32(a)(7)(B).  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Joel S. Sansone
Joel S. Sansone, Esquire
PA ID No. 41008
Attorney for the Plaintiff
Suite 1700, Three Gateway Center
401 Liberty Avenue
Pittsburgh, Pennsylvania 15222
(412) 281-9194

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-3096

WARREN BIRCHER, SR.,

Plaintiff, Appellant,

v.

JAMES A. PIERCE and SCOTT KROFCHEK,

Defendants, Appellees.

APPENDIX
VOLUME I - Pages 1 through 32

On Appeal from an Memorandum Opinion and Order of Court
of the United States District Court for the
Western District of Pennsylvania, Civil Action No. 12-0528
dated June 20, 2014, granting dismissal.

COUNSEL FOR APPELLANT

Joel S. Sansone, Esquire
LAW OFFICES OF JOEL SANSONE
Three Gateway Center, Suite 1700
401 Liberty Avenue
Pittsburgh, Pennsylvania 15222
412.281.9194

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WARREN ERNEST BIRCHER, SR.,    )
                               )
         Plaintiff,            )        Civil Action No. 12-0528
                               )
    v.                         )        Honorable Cathy Bissoon
                               )
JAMES A. PIERCE and            )
SCOTT KROFCHEK                 )
                               )
         Defendants.           )

## NOTICE OF APPEAL

Please take notice that Plaintiff hereby appeals the Court's Memorandum and Order and

Judgment dated June 20, 2014, granting summary judgment in the above-captioned matter.

Respectfully submitted,

LAW OFFICES OF JOEL SANSONE

s/Joel S. Sansone
Joel S. Sansone, Esquire
Attorney for the Plaintiff
PA ID No. 41008
Three Gateway Center, Suite 1700
401 Liberty Avenue
Pittsburgh, Pennsylvania 15222
(412) 281-9194

Dated: June 23, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WARREN ERNEST BIRCHER, SR.          )
                                    )
              Plaintiff,            )
                                    )
      v.                            )      Civil Action No. 12-528
                                    )
JAMES A PIERCE and                  )
SCOTT KROFCHEK,                     )      Judge Cathy Bissoon
                                    )
              Defendants.           )

## MEMORANDUM AND ORDER

### I.     MEMORANDUM

Presently before the Court is Defendants' Motion for Summary Judgment (Doc. 28).
Defendants seek summary judgment on the sole remaining count of malicious prosecution
against Defendants pursuant to 42 U.S.C. § 1983.  For the reasons stated herein, Defendants'
Motion will be granted.

### A. Procedural Background

According to the allegations in the Complaint (Doc. 1), on January 21, 2009, Warren
Ernest Bircher ("Plaintiff") was arrested and charged with criminal homicide, two counts of
criminal conspiracy to commit criminal homicide and concealing the death of a child.
Doc. 1 ¶ 6.  On August 5, 2010, a jury returned a verdict of not guilty on all counts.  Id. at ¶ 47.
Plaintiff brings this lawsuit pursuant to 42 U.S.C. § 1983 for violations of his Fourth Amendment
rights.  Specifically, Plaintiff claims that his arrest and detention were the result of malicious
prosecution by Pennsylvania State Police Troopers James A. Pierce and Scott Krofchek
(collectively referred to as "Defendants").  Id. at ¶ 52.  The crux of Plaintiff's claim is that his

arrest was made pursuant to an arrest warrant that lacked probable cause. Plaintiff asserts that

Defendants omitted certain material facts from the affidavit of probable cause submitted in

support of his arrest warrant, facts that, if included, would have established a lack of probable

cause. See generally Doc. 1.

### B. Factual Background

The facts of this case span an eight year criminal investigation into the tragic death of an

infant girl. As the facts are well known to the parties, the Court recites only those facts central to

its decision. The facts that follow, unless otherwise noted, are undisputed or construed in the

light most favorable to Plaintiff.

On June 4, 2000, the corpse of a newborn infant, later named "Baby Mary" by

investigators, was found in Cove Run Creek along Yauger Hallow Road in North Union

Township, Pennsylvania. Concise Statement of Material Fact ¶ 1 (Doc. 30). The initial

investigation into Baby Mary's death ("2000 Investigation") did not lead to an arrest, and in

2004 the case was classified as a "cold case." Id. at ¶ 4. In early-2007, the cold case was reopened

and assigned to Defendant Pierce for investigation. Id. at ¶ 5.

On June 12, 2008, Defendant Pierce interviewed Timothy Reckner ("Reckner"), a then

inmate at the Fayette County Jail. Id. at ¶ 8. During the interview, Reckner stated that

approximately one month before Baby Mary was discovered he attended a party at a local gathering

spot known as "the Moon." Homicide Investigative Report, pp. 94-95 (Doc. 31, Ex 1). Reckner

also stated that at some point during the party a "skinny dark haired kid with long hair" stated that

one of his "hos was pregnant" and he was going to "get rid of the kid" by placing it in a bag and

drowning it. Id. According to Reckner, this person stated that he had disposed of animals in a

similar manner. Id. Reckner identified the "skinny dark haired kid with long hair" as the husband or

boyfriend of Kristie Hawk-Bircher ("Hawk-Bircher").[1]  During the interview, Defendant Pierce

showed Reckner a photograph of Plaintiff and Reckner confirmed that Plaintiff was the "skinny dark

haired kid with long hair" who made the statements at "the Moon." Id. Reckner also stated that

Plaintiff and Hawk-Bircher lived across from Cove Run Church along Yauger Hollow Road.

Id. at 95.

At some point prior to Reckner's statement, Defendant Pierce obtained a salvia sample from

Hawk-Bircher for DNA analysis. Id. at 201.  On or about July 30, 2008, the results of the DNA

analysis revealed that while Hawk-Bircher was not Baby Mary's mother, Baby Mary was a maternal

relative to Hawk-Bircher. Id. at 206.  As a result, Defendant Pierce obtained search warrants for

DNA samples of Hawk-Bircher's sisters, including Sarah Hawk ("Hawk"). Id. at 30.  The results

revealed that Sarah Hawk was Baby Mary's mother. Doc. 30 at ¶ 18.

On November 21, 2008, an arrest warrant was issued for Hawk. Id. at ¶ 20.  On the same day

Hawk gave a statement to Defendant Pierce about the death of Baby Mary.[2] Doc. 31, Ex. 1 at p. 30.

Hawk stated that she gave birth to Baby Mark in her room at her parents' home and that following

the birth she did not feel the baby move or hear it cry. Id. Hawk stated that she then wrapped the

baby in a shirt belonging to her father, placed the baby in a backpack, walked to the end of her

parents' driveway and placed the backpack in Cove Run Creek. Id. Hawk stated that she acted

alone. Id.

On December 8, 2008, Hawk gave a second statement to Defendants Pierce and Krofchek[3],

this time in the presence of her attorney, Charles Gentile. Id. at 34.  In this statement, Hawk

---

[1]    In his statement to police, Reckner identified Hawk-Bircher as "Krissy Hawk."

[2]    Sarah Hawk was interviewed by police during the 2000 Investigation.  At that time, Hawk
told police that she had "never been pregnant" and had no idea who may have murdered Baby
Mary. Doc. 31, Ex. 1 at p.7

[3]    It appears that Defendant Krofchek had limited involvement in the investigation.  A review
of the record reveals that Krofchek was present at the December 8, 2008 Hawk interview, but
further review reveals little mention of Krofchek related to the investigation.

implicated Plaintiff in the death of Baby Mary. Hawk stated that while at her sister and Plaintiff's home (a trailer located in front of her parent's home), she informed Plaintiff that she was pregnant and concerned that her parents would not approve because the baby's father was African-American. Id. According to Hawk, she then went into labor and Plaintiff help to deliver the baby. Id. Thereafter, Plaintiff wrapped the baby in a shirt, placed it in plastic bags and a backpack and then placed the backpack in the Cove Run Creek. Id.

On or about December 9, 2008, Pierce interviewed Plaintiff. Doc. 30 ¶ 26. Plaintiff denied any involvement in the death of Baby Mary. Id. On January 19, 2009, Hawk provided a third statement to police in which she provided further detail regarding her relationship with Plaintiff. Id. ¶ 30. In this statement, as outlined in the affidavit of probable cause quoted below, Hawk indicated that she and Plaintiff had an ongoing sexual relationship and when she told Plaintiff she was pregnant, he expressed concerned the he could be the child's father. Id. Hawk's account of the night of Baby Mary's delivery was relatively the same, with the addition that she and Plaintiff engaged in sexual intercourse immediately before she went into labor. Id.

On January 20, 2009, police obtained an arrest warrant for Plaintiff based on an affidavit of probable cause signed by Defendant Pierce. A reasonable reading of the affidavit reveals, and the parties agree, that it was based primarily on the statements of Hawk and Reckner. Those relevant paragraphs read as follows:

- "On 06/04/00, this officer and other criminal investigators responded to the area known as Yauger Hollow Road for a report that an infant baby was found inside a series of plastic bags and a backpack and placed in Cove Run Creek, North Union Twp. Upon this officer's arrival, it was confirmed that the victim was an infant baby which looked to be full term. This investigation was reassigned to this officer in January of 2007." Affidavit of Probable Cause ¶ 1 (Doc. 37, Ex. 10).
- "On 06/12/08 at 1045 hrs this officer interviewed Timothy Michael RECKNER, age-34, at the Fayette County Prison. RECKNER related that he used to party at the "Moon". The "Moon" is a party spot located off Braddock Road going up toward Jumonville.

RECKNER stated that the Moon is located in the woods near a radio tower. A couple of months before the baby was found in the creek he was at a party at the Moon when Warren BIRCHER showed up with other people. One of the girls who was with BIRCHER was Rhonda DURITSKY. RECKNER advised that BIRCHER was Krissy HAWK'S husband or boyfriend and that he & HAWK lived across from the Cove Run Church along Yauger Hollow Road. RECKNER stated that he recalls BIRCHER saying that someone was pregnant and he was going to get rid of the kid. According to RECKNER, BIRCHER said he was going to put the child in a bag & drown it just like he does his animals because she doesn't have the nerve to do it & he cannot afford another child." Id. ¶ 6

- "On 01/19/09 Sarah HAWK was interviewed at the Fayette County Prison within the presence of her attorney Charles GENTILE. HAWK waived her Miranda Rights and stated that she and her brother-in-law, Warren BIRCHER (defendant) were having sexual intercourse. HAWK stated that she told BIRCHER that she was pregnant to a black boy. HAWK stated that BIRCHER became nervous because he thought the baby could be his child. HAWK stated that BIRCHER told her not to worry and that he was going to take care of it, and put the baby in a creek. HAWK stated that BIRCHER told her the baby could not be born because if it was a black baby her dad would not accept it and if it was his child Kris, his Wife, would hate him. HAWK stated that she told BIRCHER okay and about a month or month and a half later she was at her sister's house and BIRCHER was drinking, and she and Kris were watching television. HAWK said after Kris went to bed, she and BIRCHER started having sexual intercourse. HAWK stated at one point her stomach started hurting, so she and BIRCHER stopped having sex. HAWK stated that she started to cramp and went to use the bathroom. HAWK stated that she then walked outside and sat on the steps and BIRCHER came out and asked her if she was alright. HAWK stated that BIRCHER told her she was in labor. HAWK stated that she told BIRCHER to go and get KRIS. She said BIRCHER told her that it was okay and he was going to take care of it. HAWK stated that she layed down on the ground and the pain got worse and the baby came out. HAWK stated that she asked BIRCHER what were they going to do and BIRCHER said, "What I told you I was going to do." HAWK stated that BIRCHER went inside the trailer and got bags and a backpack. HAWK stated that BIRCHER came out and put the baby in the bags. HAWK stated that she started crying and BIRCHER told her not to worry because she didn't want the baby anyway just in case it was black. HAWK stated that she went inside the trailer to clean herself and when she finished BIRCHER came in and said he put the baby in the creek. HAWK stated that when the baby was found BIRCHER told her to say she didn't know anything; but later on he told her that if she had to give a DNA test, then when she got picked up to tell them that she helped and put the backpack in the creek." Id. at ¶ 10.

### Analysis

#### A. Qualified Immunity

Defendants first argue that summary judgment is appropriate because both are immune from liability under the doctrine of qualified immunity. See Defs' Br. p. 3 (Doc. 29). The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights. Pearson v. Callahan, 555 U.S. 223, 231-232 (2009).

When qualified immunity is applied in the execution of an arrest warrant, government agents are generally entitled to rely on a judicially secured warrant for immunity from liability for unconstitutional arrests. Malley v. Briggs, 475 U.S. 335, 340 (1986). Only "where the warrant application is so lacking in indicia of probable cause as to render official belief in [the] existence [of probable cause] unreasonable, will the shield of immunity be lost." Id. at 344-45. Accordingly, the Court must first evaluate Plaintiff's malicious prosecution claim in order to determine the existence of probable cause.[4]

#### B. The Existence of Probable Cause

To prevail on a claim of malicious prosecution under §1983, a plaintiff must establish that: (1) defendant initiated a criminal proceeding; 2) the proceeding was initiated without

---

[4] Defendants also raise the defense of derivative absolute prosecutorial immunity, to which Plaintiff offers no response. The Court finds that this defense is not applicable in this case. It is well-settled that absolute prosecutorial immunity is a shield from suit when a prosecutor acts within the scope of his/her duties in initiating and pursuing a criminal prosecution. Imbler v. Pachtman, 424 U.S. 409, 410 (1976). However, the concept of derivative absolute prosecutorial immunity has been applied in a limited context to shield individuals who are employed by a prosecutor to perform investigative tasks that are "intimately associated with the judicial phase of the criminal process." Davis v. Grusemeyer, 996 F.2d 617,631 (3d Cir. 1993). In this case, Defendants were not employed by prosecutors to perform investigative tasks. To the contrary, Defendants were employed as Pennsylvania state troopers and have available, if applicable, the shield of qualified immunity.

probable cause; 3) the criminal proceeding ended in plaintiff's favor; 4) defendant acted

maliciously or for a purpose other than bringing the plaintiff to justice; and 5) plaintiff suffered

deprivation of liberty consistent with the concept of seizure as a consequence of a legal

proceeding. See Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009). The absence of probable

cause is an essential element of a malicious prosecution claim, and such a claim cannot proceed

if probable cause existed—regardless of whether the arrest at issue was a wise or typical use of

police resources. See Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).

Based on the briefs, the parties agree that the central issue to be resolved in this case is

whether a genuine issue of material fact exists as to whether probable cause existed to arrest

Plaintiff. Plaintiff argues that the affidavit of probable cause turns on the statements of two

witnesses, namely Sarah Hawk and Timothy Reckner. Plaintiff challenges the legal sufficiency

of the affidavit because, as Plaintiff argues, Defendants recklessly omitted critical facts related to

Hawk and Reckner's statements, omissions that if included in the affidavit, would establish a

lack of probable cause. Defendants argue that the affidavit of probable cause contained all

critical facts, and to the extent critical facts were omitted, those facts were not material to a

finding of probable cause. Generally, the determination of probable cause is an issue of fact to

be determined by a jury. However, a district court may conclude "that probable cause exists as a

matter of law if the evidence, viewed most favorably to plaintiff, reasonably would not support a

contrary factual finding." Merkle v. Upper Dublin School Dist., 211 F.3d 782, 788–89 (3d Cir.

2000).

As to Hawk's statements, Plaintiff argues that Defendants recklessly omitted the fact that

Hawk gave factually inconsistent statements to police. Pl.'s Br. at p. 8 (Doc. 38). Plaintiff

argues that the affidavit of probable cause should have included the fact that Hawk did not

implicate Plaintiff in her first statement to police, but instead, as reflected in the record, implicated Plaintiff in her second statement to police.[5] In order to successfully challenge the sufficiency of the affidavit of probable cause, Plaintiff must establish that Defendant's "knowingly and deliberately, or with reckless disregard for the truth, made omissions that created a falsehood in applying for a warrant, and that such statements or omissions are material or necessary to the finding of probable cause." Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000). The Court of Appeals for the Third Circuit has advised that omissions from an affidavit of probable cause "are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known is the kind of thing the judge would wish to know." Id.

The Court agrees with Plaintiff that the changing nature of Hawk's story of what happened the night of Baby Mary's death is something a reasonable person would know a judge would want to know. Undoubtedly, the fact that Hawk initially stated that she acted alone and then, days later, stated that Plaintiff helped to deliver and then disposed of Baby Mary is something that should be known to a judge reviewing an affidavit of probable cause.[6] However, that is not the end of the inquiry. Plaintiff must also establish that the omitted fact was material, or necessary to the finding of probable cause. See Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). The evidence of record, when viewed in a light most favorable to Plaintiff, reveals that the above-noted omission does not destroy the existence of probable cause.

---

[5]   This count does not include Hawk's statement during the 2000 Investigation in which she denied ever being pregnant.
[6]   The record does not support Plaintiff's assertion that prior to her December 8, 2008 statement to police Hawk and her attorney received a copy of the affidavit of probable cause supporting the search warrant for the collection of her DNA. Pl.'s Counterstatement of Fact, ¶ P-7 (Doc. 36). Plaintiff suggests that Hawk only implicated Plaintiff after reading Reckner's statement Concerning Plaintiff (which was contained in the affidavit). Nonetheless, it is clear that Hawk did not implicate Plaintiff until her December 8, 2008 statement to police.

The Court finds that, as a matter of law, Reckner's statements were sufficient to establish probable cause to arrest Plaintiff. Reckner acted as an informant to police, offering a "tip" that Plaintiff was likely involved in the death of Baby Mary. Reckner's statements were corroborated by the location of Baby Mary's body, and Plaintiff offers no viable evidence that Defendants made false statements or critical omissions related to Reckner's statements.[7] As a result, Defendants are entitled to summary judgment.

---

[7] Plaintiff presents multiple arguments to support the position that Defendants had reason to doubt the accuracy of Reckner's statements. See generally Doc. 38. In sum, Plaintiff's arguments are dependent upon jail-house telephone conversations Reckner had with an unidentified woman before and after he met with police. Id. at 11. Plaintiff argues that the call transcripts reveal that Defendants not only had reason to doubt the veracity of Reckner's statements, but also reveal that police suspected Reckner in the crime, and that these facts "taint" Reckner's statement. Id. at 12-15. The Court finds that Plaintiff's arguments are based on pure speculation and conjecture and have no merit. There is nothing in the record to suggest that Defendants made false statements or critical omissions related to Reckner's statements. Furthermore, the calls represent statements made by Reckner to an unknown third-party and there is no evidence that the statements are reflective of what was known or believed by Defendants at the time.

In addition, the Court rejects Plaintiff's attempts to challenge Defendants' investigative techniques. Despite Plaintiff's arguments to the contrary, there is no evidence that Defendants ignored exculpatory evidence or "invented" inculpatory evidence. Plaintiff's arguments are appropriate to argue the existence of reasonable doubt, not to negate the existence of probable cause for Plaintiff's arrest. See United States v. Miknevich, 638 F.3d 178 , 182 (3d Cir. 2011) (probable cause does not require that the prosecution have sufficient evidence to prove guilt beyond a reasonable doubt).

## II.     <u>ORDER</u>

For the reasons stated above, the Court hereby **ORDERS** that Defendants' Motion for

Summary Judgment is **GRANTED**.


**IT IS SO ORDERED**.

<u>s/ Cathy Bissoon</u>
Cathy Bissoon
United States District Judge

June 20, 2014

cc (via e-mail):

All counsel of record.

ACS,APPEAL,CLOSED

**U.S. District Court**
**Western District of Pennsylvania (Pittsburgh)**
**CIVIL DOCKET FOR CASE #: 2:12-cv-00528-CB**

BIRCHER v. PIERCE et al
Assigned to: Judge Cathy Bissoon
Case in other court: Third Circuit, 14-03096
Cause: 42:1983 Civil Rights Act

Date Filed: 04/20/2012
Date Terminated: 06/20/2014
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**WARREN ERNEST BIRCHER, SR.**            represented by **Joel S. Sansone**
Law Offices of Joel Sansone
Three Gateway Center, Suite 1700
401 Liberty Avenue
Pittsburgh, PA 15222
(412) 281-9194
Email: joelsansone03@msn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Gesk**
Wayman, Irvin & McAuley
Suite 1700, Three Gateway Center
401 Liberty Avenue
Pittsburgh, PA 15222-1004
(412) 566-2970
Fax: (412) 391-1464
Email: jgesk@waymanlaw.com
*ATTORNEY TO BE NOTICED*

**Mark J. Gesk**
Wayman, Irvin & McAuley
Suite 1700, Three Gateway Center
401 Liberty Avenue
Pittsburgh, PA 15222-1004
(412) 566-2970
Email: mgesk@waymanlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**JAMES A. PIERCE**                    represented by **Robert A. Willig**
*in his official and individual capacities*            Office of Attorney General
564 Forbes Avenue

Manor Complex, 6th Floor
Pittsburgh, PA 15219
(412) 565-5696
Email: rwillig@attorneygeneral.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT KROFCHEK**                    represented by    **Robert A. Willig**
*in his official and individual capacities*            (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/20/2012 | 1 | COMPLAINT against SCOTT KROFCHEK, JAMES A. PIERCE (Filing fee $350, receipt number 0315-2338995), filed by WARREN ERNEST BIRCHER, SR. (Attachments: # 1 Civil Cover Sheet) (ksa2) (Entered: 04/24/2012) |
| 04/25/2012 | 2 | NOTICE of Appearance by Mark J. Gesk on behalf of WARREN ERNEST BIRCHER, SR. (Gesk, Mark) (Entered: 04/25/2012) |
| 04/25/2012 | 3 | NOTICE of Appearance by Jonathan M. Gesk on behalf of WARREN ERNEST BIRCHER, SR. (Gesk, Jonathan) (Entered: 04/25/2012) |
| 05/15/2012 | 4 | NOTICE of Appearance by Robert A. Willig on behalf of SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) (Entered: 05/15/2012) |
| 05/16/2012 | 5 | WAIVER OF SERVICE Returned Executed by WARREN ERNEST BIRCHER, SR. JAMES A. PIERCE waiver sent on 4/25/2012, answer due 6/25/2012. (Gesk, Jonathan) (Entered: 05/16/2012) |
| 05/16/2012 | 6 | WAIVER OF SERVICE Returned Executed by WARREN ERNEST BIRCHER, SR. SCOTT KROFCHEK waiver sent on 4/25/2012, answer due 6/25/2012. (Gesk, Jonathan) (Entered: 05/16/2012) |
| 06/25/2012 | 7 | PARTIAL MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by SCOTT KROFCHEK, JAMES A. PIERCE. (Attachments: # 1 Exhibit A, # 2 Proposed Order) (Willig, Robert) Modified on 6/26/2012. (jsp) (Entered: 06/25/2012) |
| 06/25/2012 | 8 | BRIEF in Support re 7 Partial Motion to Dismiss for Failure to State a Claim filed by SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) Modified on 6/26/2012. (jsp) (Entered: 06/25/2012) |
| 06/25/2012 |  | ORDER Response/Briefing Schedule re 7 Partial Motion to Dismiss for Failure to State a Claim. Responses due by 7/16/2012. Signed by Judge Cathy Bissoon on 6/25/2012. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dad) Modified on 6/26/2012. (jsp) (Entered: 06/25/2012) |
| 06/29/2012 | 9 | BRIEF in Opposition re 7 Motion to Dismiss for Failure to State a Claim filed by WARREN ERNEST BIRCHER, SR. (Gesk, Jonathan) (Entered: 06/29/2012) |

| 07/03/2012 | 10 | Defendants move for dismissal of Plaintiff's false arrest and false imprisonment claims on statute of limitations grounds. (Doc. 7 at 2). Plaintiff concedes their argument. (Doc. 9 at 1-2). Accordingly, IT IS HEREBY ORDERED that Defendants' partial motion to dismiss (Doc. 7 ) is GRANTED. This order does not dispose of Plaintiff's malicious prosecution claims. Signed by Judge Cathy Bissoon on 7/03/2012. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dad) (Entered: 07/03/2012) |
|---|---|---|
| 07/03/2012 | | Order to Answer: set answer deadline for all Defendants. Answer due 7/17/2012. Signed by Judge Cathy Bissoon on 7/3/2012. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dad) (Entered: 07/03/2012) |
| 07/17/2012 | 11 | ANSWER to 1 Complaint by SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) (Entered: 07/17/2012) |
| 07/17/2012 | 12 | ORDER, Case Management Conference set for 9/11/2012 10:00 AM before Judge Cathy Bissoon, more fully stated said order. Consent to jurisdiction by Magistrate Judge due on or before 7/31/2012. Signed by Judge Cathy Bissoon on 7/17/12. (jhi) Modified on 7/18/2012 to add additional docket text. (ksa2) (Entered: 07/17/2012) |
| 09/05/2012 | 13 | REPORT of Rule 26(f) Planning Meeting. (Gesk, Jonathan) (Entered: 09/05/2012) |
| 09/05/2012 | 14 | JOINT STIPULATION selecting ADR process by WARREN ERNEST BIRCHER, SR, SCOTT KROFCHEK, JAMES A. PIERCE (Gesk, Jonathan) Modified on 9/6/2012 to add additional docket text. (ksa2) (Entered: 09/05/2012) |
| 09/11/2012 | 15 | Minute Entry for proceedings held before Judge Cathy Bissoon: Case Management Conference held on 9/11/2012. (Court Reporter: None) Order to follow. (jhi) (Entered: 09/11/2012) |
| 09/11/2012 | 16 | CASE MANAGEMENT ORDER: Exchange of required Rule 26(a)(1) information due by 10/11/2012. Amended Pleadings due by 10/11/2012. Joinder of Parties due by 10/11/2012. Fact Discovery due by 2/11/2013. A Post-Discovery Status / Settlement Conference is set for 2/21/2013 at 10:00 AM before Judge Cathy Bissoon. IT IS FURTHER ORDERED that this case is referred to Early Neutral Evaluation. Maria Greco Danaher is appointed as early neutral evaluator. Early Neutral Evaluation shall take place on or before 11/13/2012. As more fully stated in the Order. Signed by Judge Cathy Bissoon on 9/11/2012. (dad) (Entered: 09/11/2012) |
| 09/26/2012 | 17 | Notice of ADR proceeding: **The litigants are advised that at the conclusion of the ADR process they must submit a completed questionnaire to the Clerk of Courts. The questionnaire is available on the Court's website at www.pawd.uscourts.gov and click on the ADR icon.** Early Neutral Evaluation set for 11/6/2012 09:30 AM. (Danaher, Maria) (Entered: 09/26/2012) |
| 11/06/2012 | 18 | REPORT of Early Neutral Evaluation. Case has not resolved. **The parties are reminded of their obligation to complete the ADR questionnaire and return same to the Clerk of Court within 5 days of the conclusion of the ADR process. The questionnaire can be accessed at www.pawd.uscourts.gov. Click on the ADR icon.** ENE session was held on 11/6/2012. (Danaher, Maria) Modified on |

| | | |
|---|---|---|
| | | 11/7/2012 to correct typo. (ksa) (Entered: 11/06/2012) |
| 02/07/2013 | 19 | MOTION for Extension of Time to Complete Discovery by SCOTT KROFCHEK, JAMES A. PIERCE. (Attachments: # 1 Proposed Order) (Willig, Robert) (Entered: 02/07/2013) |
| 02/07/2013 | | ORDER granting 19 Motion for Extension of Time to Complete Discovery. Fact Discovery due by 4/12/2013. A Post-Discovery Status / Settlement Conference is set for 5/3/2013 at 10:00 AM before Judge Cathy Bissoon. All other deadlines and requirements set forth in the 16 Case Management Order remain in effect. Signed by Judge Cathy Bissoon on 2/7/2013. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dad) (Entered: 02/07/2013) |
| 03/28/2013 | 20 | MOTION for Extension of Time to Complete Discovery by WARREN ERNEST BIRCHER, SR. (Attachments: # 1 Proposed Order) (Gesk, Jonathan) (Entered: 03/28/2013) |
| 03/28/2013 | | ORDER Response/Briefing Schedule re Plaintiff's request for expert discovery deadlines in his 20 Motion for Extension of Time to Complete Discovery. Response to Motion due by 4/8/2013. Signed by Judge Cathy Bissoon on 3/28/2013. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dad) (Entered: 03/28/2013) |
| 04/04/2013 | 21 | RESPONSE to Motion re 20 MOTION for Extension of Time to Complete Discovery filed by SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) (Entered: 04/04/2013) |
| 04/04/2013 | | A Telephone Status Conference is set for 4/8/2013 at 10:30 AM before Judge Cathy Bissoon. Counsel for Plaintiff is responsible for initiating the conference call. Signed by Judge Cathy Bissoon on 4/4/2013. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dad) (Entered: 04/04/2013) |
| 04/08/2013 | | ORDER granting 20 Motion for Extension of Time to Complete Discovery. Fact Discovery due by 6/12/2013. The Post-Discovery Status/Settlement Conference is rescheduled for 7/1/2013 at 10:00 AM before Judge Cathy Bissoon. Expert discovery deadlines will not be set at this time. Signed by Judge Cathy Bissoon on 4/8/2013. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dad) (Entered: 04/08/2013) |
| 04/08/2013 | 22 | Minute Entry for proceedings held before Judge Cathy Bissoon: Telephone Status Conference held on 4/8/2013. (Court Reporter: None) (jhi) (Entered: 04/09/2013) |
| 06/24/2013 | 23 | MOTION to Continue Post-Discovery Conference by WARREN ERNEST BIRCHER, SR. (Attachments: # 1 Proposed Order) (Sansone, Joel) (Entered: 06/24/2013) |
| 06/25/2013 | | ORDER granting 23 Motion to Continue, Post Discovery Status/ Settlement Conference set for 7/1/13 is now RESCHEDULED to 8/8/2013 at 10:00 AM before Judge Cathy Bissoon. All other conditions in Case Management Order dated 9/11/12 16 remain in effect. Signed by Judge Cathy Bissoon on 6/25/13. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (jhi) (Entered: 06/25/2013) |

| 08/08/2013 | 24 | Minute Entry for proceedings held before Judge Cathy Bissoon: Settlement Conference held on 8/8/2013. Order to follow. (Court Reporter: None) (dad) (Entered: 08/08/2013) |
|---|---|---|
| 08/08/2013 | 25 | CASE MANAGEMENT ORDER: Summary Judgment due by 9/9/2013. Response to Summary Judgment due by 10/9/2013. As more fully stated in the Order. Signed by Judge Cathy Bissoon on 8/8/2013. (dad) (Entered: 08/08/2013) |
| 09/09/2013 | 26 | MOTION to Extend Time to File Motion for Summary Judgment by SCOTT KROFCHEK, JAMES A. PIERCE. (Attachments: # 1 Proposed Order) (Willig, Robert) (Entered: 09/09/2013) |
| 09/09/2013 | | ORDER granting 26 Defendants' Motion to Extend Time to File Motion for Summary Judgment. Summary Judgment now is due by 10/9/13, and responses are due by 11/8/13. All other terms of the CMO dated 8/8/13 (Doc. 25 ) shall remain in effect. Signed by Judge Cathy Bissoon on 9/9/13. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 09/09/2013) |
| 10/09/2013 | 27 | MOTION to Extend Time to File Motion for Summary Judgment by SCOTT KROFCHEK, JAMES A. PIERCE. (Attachments: # 1 Proposed Order) (Willig, Robert) (Entered: 10/09/2013) |
| 10/10/2013 | | ORDER granting 27 Defendants' Motion to Extend Time to File Motion for Summary Judgment. Defendants' deadline is extended until 11/8/13, and no further extensions will be granted. Plaintiff's Response to Summary Judgment now is due by 12/9/13. Signed by Judge Cathy Bissoon on 10/10/13. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 10/10/2013) |
| 11/06/2013 | 28 | MOTION for Summary Judgment by SCOTT KROFCHEK, JAMES A. PIERCE. (Attachments: # 1 Proposed Order) (Willig, Robert) (Entered: 11/06/2013) |
| 11/06/2013 | 29 | BRIEF in Support re 28 Motion for Summary Judgment filed by SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) (Entered: 11/06/2013) |
| 11/06/2013 | 30 | CONCISE STATEMENT OF MATERIAL FACTS by SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) (Entered: 11/06/2013) |
| 11/06/2013 | 31 | Appendix to 30 Concise Statement of Material Facts by SCOTT KROFCHEK, JAMES A. PIERCE. (Attachments: # 1 Exhibit A (Part 1), # 2 Exhibit A (Part 2), # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K) (Willig, Robert) (Entered: 11/06/2013) |
| 12/05/2013 | 32 | MOTION for Extension of Time to File Response/Reply as to 30 Concise Statement of Material Facts, 29 Brief in Support of Motion, 28 MOTION for Summary Judgment, 31 Appendix, by WARREN ERNEST BIRCHER, SR. (Attachments: # 1 Proposed Order) (Sansone, Joel) (Entered: 12/05/2013) |
| 12/05/2013 | | ORDER granting 32 Plaintiff's Motion for Extension of Time to File Response re 28 Defendants' Motion for Summary Judgment. Plaintiff's response now is due by 1/8/14. Signed by Judge Cathy Bissoon on 12/5/13. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or |

| | | Notice on the matter. (dcd) (Entered: 12/05/2013) |
|---|---|---|
| 12/10/2013 | 33 | MOTION to Compel all polygraph tests, results and identity of those who administered the tests by WARREN ERNEST BIRCHER, SR. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order) (Sansone, Joel) (Entered: 12/10/2013) |
| 12/12/2013 | | ORDER denying 33 Plaintiff's Motion to Compel all polygraph tests, results and identity of those who administered the tests. Plaintiff's Motion comes over 10 months after the original discovery deadline, and over 6 months after the final discovery deadline, which was established through the Court's grant of a 2-month extension requested by Plaintiff. Plaintiff offers no meaningful explanation for the delay, and addressing his Motion now would unduly prejudice Defendants (who already have moved for summary judgment) and undermine the judicial and public interests in timely and orderly resolving disputes presented to this tribunal. Signed by Judge Cathy Bissoon on 12/12/13. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 12/12/2013) |
| 12/13/2013 | 34 | MOTION for Reconsideration re Order on Motion to Compel, by WARREN ERNEST BIRCHER, SR. (Attachments: # 1 Proposed Order) (Sansone, Joel) (Entered: 12/13/2013) |
| 12/13/2013 | | ORDER Response re 34 Plaintiff's Motion for Reconsideration. Defendant shall respond by 12/23/13. The response may address both the request for reconsideration and the merits of the underlying Motion to Compel. Signed by Judge Cathy Bissoon on 12/13/13. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 12/13/2013) |
| 12/23/2013 | 35 | RESPONSE to Motion re 34 MOTION for Reconsideration re Order on Motion to Compel, filed by SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) (Entered: 12/23/2013) |
| 01/02/2014 | | Order denying 34 Plaintiff's Motion for Reconsideration, for all of the reasons stated in Defendant's Response (Doc. 35 ). The analyses in Defendant's Response hereby are adopted as the reasoning of the Court. Signed by Judge Cathy Bissoon on 1/2/14. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 01/02/2014) |
| 01/08/2014 | 36 | COUNTER STATEMENT OF FACTS 30 Concise Statement of Material Facts by WARREN ERNEST BIRCHER, SR. (Sansone, Joel) (Entered: 01/08/2014) |
| 01/08/2014 | 37 | Appendix to 36 Counter Statement of Facts by WARREN ERNEST BIRCHER, SR. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C1, # 4 Exhibit C2, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I) (Sansone, Joel) (Entered: 01/08/2014) |
| 01/08/2014 | 38 | BRIEF in Opposition re 28 Motion for Summary Judgment filed by WARREN ERNEST BIRCHER, SR. (Sansone, Joel) (Entered: 01/08/2014) |
| 01/22/2014 | 39 | MOTION to Extend Time to File Response to Plaintiff's Counterstatement of Facts by SCOTT KROFCHEK, JAMES A. PIERCE. (Attachments: # 1 Proposed Order) (Willig, Robert) (Entered: 01/22/2014) |

| 01/22/2014 | | ORDER granting 39 Defendants' Motion to Extend Deadline for Responding to Plaintiff's Counterstatement of Facts. Defendants' response now is due by 1/29/14. Signed by Judge Cathy Bissoon on 1/22/14. Text-only entry; no PDF document will issue. This text-only entry constitutes the Order of the Court or Notice on the matter. (dcd) (Entered: 01/22/2014) |
|---|---|---|
| 01/29/2014 | 40 | RESPONSE to 36 Counter Statement of Facts, filed by SCOTT KROFCHEK, JAMES A. PIERCE. (Willig, Robert) (Entered: 01/29/2014) |
| 06/20/2014 | 41 | MEMORANDUM and ORDER granting 28 Motion for Summary Judgment. Signed by Judge Cathy Bissoon on 6/20/2014. (acs) Modified on 6/23/2014 to add additional docket text. (ksa) (Entered: 06/20/2014) |
| 06/20/2014 | 42 | JUDGMENT in favor of Defendants and against Plaintiff. Signed by Judge Cathy Bissoon on 6/20/2014. (acs) (Entered: 06/20/2014) |
| 06/23/2014 | 43 | NOTICE OF APPEAL as to 42 Judgment, 41 Order on Motion for Summary Judgment by WARREN ERNEST BIRCHER, SR. Filing fee $505, receipt number 0315-3238096. Motion for IFP N/A, Certificate of Appealability N/A, Court Reporter: None. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. The Transcript Purchase Order form will NOT be mailed to the parties. The form is available on the Court's internet site. (Sansone, Joel) Modified on 6/24/2014 to add additional docket text. (ksa) (Entered: 06/23/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/29/2014 17:12:57 | | |
| **PACER Login:** | ss1114 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:12-cv-00528-CB |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WARREN ERNEST BIRCHER, SR.,      )
                                 )
                Plaintiff,       )          Civil Action No.
                                 )
v.                               )
                                 )
JAMES A. PIERCE in his official and   )
individual capacities, and SCOTT      )
KROFCHEK in his official and individual )
capacities,                      )          JURY TRIAL DEMANDED
                                 )
                Defendants.      )          *Electronically filed*

COMPLAINT IN CIVIL ACTION

COMES NOW the Plaintiff, WARREN ERNEST BIRCHER, SR., by and through his

attorneys, THE LAW OFFICES OF JOEL SANSONE and JOEL S. SANSONE, ESQUIRE, and

WAYMAN, IRVIN & McAULEY, LLC, and JONATHAN M. GESK, ESQUIRE and MARK J.

GESK, ESQUIRE, and brings this Complaint in Civil Action, and in support thereof alleges as

follows:

JURISDICTION

1.      This Honorable Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. § 1331, as the dispute arises under the Constitution, laws, or treaties of the

United States, namely, 42 U.S.C. § 1983 and the Fourth Amendment of the United States

Constitution.

2.      This Honorable Court has jurisdiction over the Defendants in this matter as at all

relevant times in the Complaint they were residents of the Western District of Pennsylvania and

thus subject to its jurisdiction.

1

3.     Venue is proper pursuant to 28 U.S.C. § 1391(b) as the action is based on a federal question, and the Defendants, for the purpose of venue, reside in the Western District of Pennsylvania.

## PARTIES

4.     Plaintiff, Warren Ernest Bircher, Sr., is an adult resident of the Commonwealth of Pennsylvania, residing in the County of Fayette.

5.     Defendant, James A. Pierce (hereinafter "Pierce"), is and was at all times relevant, an officer of the Pennsylvania State Police and acting under color of state law. Upon information and belief, he is a trooper based at the station located in Uniontown, Fayette County, Pennsylvania, or one of the four (4) additional stations of Troop B. He is being sued in his official and individual capacities.

6.     Defendant, Scott Krofchek (hereinafter "Krofchek"), is and was at all times relevant, an officer of the Pennsylvania State Police and acting under color of state law. Upon information and belief, he is a trooper based at the station located in Uniontown, Fayette County, Pennsylvania, or one of the four (4) additional stations of Troop B. He is being sued in his official and individual capacities.

## FACTUAL ALLEGATIONS

7.     On or about June 4, 2000, Scott Hall and Allen Hall were fishing in Cove Run Creek in Lemont Furnace, Pennsylvania, and came across a backpack filled with plastic bags in or about the creek. They opened the backpack and discovered that it contained a deceased infant wrapped in plastic bags and a flannel shirt (hereinafter "Baby Mary").

2

8.    The Pennsylvania State Police responded to the scene of where Baby Mary was found. James Pierce, Daniel Ekis, Brian King, and other members of the Pennsylvania State Police reported to the scene, collected evidence and conducted an initial investigation.

9.    Ultimately, Baby Mary's death was ruled a homicide and an investigation was opened.

10.    Corporal Ekis was initially lead investigator on the case. He had focused his investigation on one Tiffany Dawn Duritsky, as he believed that she may have been the biological mother of Baby Mary.

11.    Corporal Ekis administered a polygraph examination of Tiffany Duritsky in 2002, which she failed. Further, Corporal Ekis was of the impression that Tiffany Duritsky was withholding information regarding the case.

12.    Defendant Pierce took over as the lead investigator for the Baby Mary case in January 2007.

13.    Plaintiff believes and therefore avers that Defendant Pierce met with Corporal Ekis shortly before taking over the investigation, at which time Corporal Ekis informed Defendant Pierce of the information he had obtained regarding the incident. Thereafter, Defendant Pierce continued with an investigation of Tiffany Duritsky and her sister, Rhonda Duritsky.

14.    Ultimately, Tiffany Duritsky was excluded as the biological mother of Baby Mary through DNA testing. Thus, Defendant Pierce focused his investigation on Rhonda Duritsky.

15.    On May 27, 2008, Defendants Pierce and Krofcheck interviewed Rhonda Duritsky's mother, Cherrie Gail Duritsky. Cherrie Duritsky revealed that she had driven Rhonda

3

Duritsky to New York in January 2003 and that Rhonda Duritsky appeared scared and wanted to leave Fayette County.

16.    Further, Cherrie Duritsky advised that Rhonda Duritsky, as noted in Defendant Pierce's investigation report, had three children with two different fathers, used drugs during the pregnancies and "slept around a lot in 1998-2000 and never used birth control."

17.    On June 12, 2008, approximately eight years after the incident, Defendant Pierce interviewed Timothy Michael Reckner in the Fayette County Prison. Per Defendant Pierce's investigation report, the sole basis for this interview being conducted was because Trooper Pierce knew Mr. Reckner resided in Lemont Furnace in 2000 and abused drugs.

18.    However, it can be surmised that Mr. Reckner sought out Defendant Pierce and/or the Pennsylvania State Police as it would be extremely unusual to question a prison inmate about a murder that occurred eight (8) years prior on the basis that that inmate was a drug user who lived in the area.

19.    In that interview, Mr. Reckner offered information about the murder of Baby Mary that had occurred eight (8) years prior. Plaintiff believes and therefore avers that Mr. Reckner received a plea deal and/or leniency on a series of unrelated crimes for which he was charged in return for the information he provided and cooperation with the Pennsylvania State Police.

20.    Moreover, the fact that Mr. Reckner allegedly possessed key evidence and/or information regarding the murder of Baby Mary raises further doubt that Defendant Pierce's interview was conducted solely because Mr. Reckner was a drug user who formerly lived in the area that Baby Mary was found.

4

21.    Mr. Reckner told Defendant Pierce that a few months before Baby Mary was found, he recalled being at the "Moon", a party spot located off Braddock Road going toward Jumonville, when Rhonda Duritsky arrived with Plaintiff.

22.    At that time, Mr. Reckner allegedly recalled that Plaintiff was upset with Rhonda Duritsky, argued with her and later confided to Mr. Reckner that Rhonda Duritsky was pregnant.

23.    Mr. Reckner told Defendant Pierce that Plaintiff implied that he was going to murder Rhonda Duritsky's baby.

24.    Defendant Pierce showed Mr. Reckner photographs of Plaintiff, Rhonda Duritsky and Tiffany Duritsky. Not surprisingly, Mr. Reckner identified the two individuals who were at the Moon as being Rhonda Duritsky and Plaintiff. Defendant Pierce's actions in showing Mr. Reckner an extremely limited array of photographs for identification purposes was an improper procedure and done so as to assist and/or encourage Mr. Reckner to target Plaintiff.

25.    On June 25, 2008, Defendant Pierce and Trooper Christian Lieberum met again with Mr. Reckner at the Fayette County Prison. Mr. Reckner drafted a written statement regarding Plaintiff's alleged statements made at the Moon months prior to Baby Mary being found, which was approximately eight and one-half (8 ½) years prior to drafting the written statement.

26.    Defendants Pierce and Liebrum did not attempt to verify Mr. Reckner's information. It was subsequently revealed at Plaintiff's criminal trial that Rhonda Duritsky did not know Plaintiff, had never been to "The Moon", and in fact was living in Newport News, Virginia during the timeframe referenced by Mr. Reckner and had not returned to Pennsylvania the entire year in 2000.

5

27.    On the same day Defendant Pierce interviewed Mr. Reckner, he interviewed two other inmates at Fayette Count Prison, Robert Williams and Matthew Fabian.

28.    Both Mr. Williams and Mr. Fabian implicated Mr. Reckner in the death of Baby Mary. However, Defendant Pierce did not create a written report regarding either interview.

29.    On July 30, 2008, through DNA testing, the Pennsylvania State Police learned that Plaintiff's wife, Christy Bircher, and Baby Mary's profiles were concordant, and thus a maternal relative (mother, sister or daughter) of Christy Bircher was Baby Mary's biological mother.

30.    On August 4, 2008, Defendant Pierce re-contacted Mr. Reckner. At this point, Defendant Pierce realized that Mr. Reckner's information was incorrect as Rhonda Duritsky was not the biological mother of Baby Mary.

31.    Mr. Reckner proceeded to change his story and stated that he was unsure of whom Plaintiff was referring to when he said a woman was pregnant and he was "going to take care of it."

32.    Subsequent DNA testing of Christy Bircher's sisters determined that Christy Bircher's sister, Sarah Sue Hawk, was the mother of Baby Mary.

33.    Subsequent DNA testing of Plaintiff determined that he was not the biological father of Baby Mary. It was ultimately determined that the father was one Hyson Ford.

34.    On November 21, 2008, Trooper David Bell and Defendant Pierce arrested Sarah Sue Hawk and transported her to the Pennsylvania State Police barracks in Uniontown, Pennsylvania.

6

35.    At the barracks, Sarah Hawk stated that she delivered Baby Mary in her bedroom at her parents' residence on Yauger Hollow Road. She graphically described the birth and explained how she wrapped Baby Mary up in a flannel shirt and placed her in the creek. At no point did she reference or suggest that Plaintiff was involved in the process.

36.    Of note, and corroborating Ms. Hawk's version of the events, the flannel shirt was determined to be that of Ms. Hawk's father.

37.    More importantly, during the interview, Sarah Hawk stated that she knew the biological father was Hyson Ford.

38.    On December 8, 2008, Defendants Pierce and Krofchek re-interviewed Sarah Hawk. At that time, Sarah Hawk stated Plaintiff helped deliver and dispose of Baby Mary in the creek. Sarah Hawk stated that she delivered the baby at Plaintiff's residence, while Plaintiff's wife, Christy Bircher, was asleep.

39.    During this same interview, Sarah Hawk stated that she never had sexual intercourse with Plaintiff and he had no reason to believe he was the biological father of Baby Mary.

40.    On December 10, 2008, Defendants Pierce and Krofchek interviewed Plaintiff. Plaintiff denied having any role in Baby Mary's death. Further, he informed Defendants Pierce and Krofchek that he was unaware Sarah Hawk was pregnant and denied ever having sexual relations with Sarah Hawk. Plaintiff volunteered to submit to a polygraph examination, which was never conducted.

7

41.    On January 4, 2009, Sarah Hawk's friend, Jennifer Lynn Riggin, was interviewed by Defendant Pierce. She stated that Sarah Hawk informed her previously in the year that she was pregnant and Hyson Ford was the father.

42.    On January 14, 2009, Defendants provided Ms. Hawk's counsel with the portion of Defendants' report that summarized Mr. Reckner's statement implicating Plaintiff and stating that Plaintiff may be the father.

43.    Upon reviewing this statement, Ms. Hawk and her counsel contacted Defendants to schedule another interview.

44.    On January 19, 2009, Defendants Pierce and Krofchek again interviewed Sarah Hawk. Ms. Hawk again changed her story, and stated that she had previously had sexual intercourse with Plaintiff and that Plaintiff could possibly be the father.

45.    Ultimately, Sarah Hawk was offered and accepted a plea agreement, in which the Commonwealth of Pennsylvania agreed to not pursue a First Degree murder charge. In return, Sarah Hawk agreed to testify against Plaintiff.

46.    Plaintiff was arrested and charged with criminal homicide, two (2) counts of criminal conspiracy to commit criminal homicide and concealing the death of a child.

47.    Plaintiff was incarcerated on January 21, 2009.

48.    He remained in prison until trial in this matter, which occurred on August 2, 2010 through August 5, 2010. At that time, a jury returned a verdict of Not Guilty on all counts against Plaintiff.

49.    Plaintiff was released from prison on August 13, 2010.

COUNT I:

8

WARREN ERNEST BIRCHER, SR. v. ALL DEFENDANTS
VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS,
SPECIFICALLY, U.S.C§1983, AND THE FOURTH AMENDMENT
OF THE UNITED STATES CONSTITUTION

50.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 49 as though fully set forth herein.

51.    Plaintiff claims damages for the injuries set forth herein under 42 U.S.C. §1983 against both Defendants for violation of Plaintiff's constitutional rights under color of law.

52.    At all times relevant hereto, pursuant to 42 U.S.C. §1983 and the Fourth Amendment to the United States Constitution, the Plaintiff had a right to be free from arrest, incarceration and prosecution without probable cause.

53.    As stated herein, the arrest, subsequent incarceration and prosecution of Plaintiff by the Defendants were an unreasonable deprivation of the Plaintiff's life and liberty without due process of law in violation of the Fourth Amendment to the United States Constitution.

54.    The conduct of each of the Defendants acting in conspiracy and each of them acting in reckless disregard and deliberate indifference, as aforementioned, deprived the Plaintiff of his rights, privileges and immunities secured under the Constitution of the United States by instituting charges against him without probable cause and with malice, vengeance, and bias such that Plaintiff was maliciously prosecuted for a crime which he did not commit and which these Defendants knew or should have known that he did not commit based upon the totality of the facts and circumstances.

55.    The criminal proceedings instituted by Defendants were undertaken maliciously, vengefully and with bias, and are alleged to have violated Plaintiff's constitutional rights,

9

deprived Plaintiff of a fair trial and of liberty without due process of law, and lacked probable cause for the following reasons:

    a.    These Defendants knew or should have known that there was no physical evidence supporting the charges against Plaintiff;

    b.    These Defendants knew or should have known that no witnesses or evidence corroborated Sarah Hawk's implication of Plaintiff in the death of Baby Mary;

    c.    These Defendants failed to test any physical evidence for a DNA match to Plaintiff, or did in fact test physical evidence for a DNA match to Plaintiff and did not establish a match and thus have omitted it from their investigation report;

    d.    These Defendants failed to test any physical evidence for a fingerprint match to Plaintiff, or did in fact test physical evidence for a fingerprint match to Plaintiff and did not establish a match and have thus omitted it from their investigation report;

    e.    These Defendants repeatedly and maliciously relied on clearly unreliable witness statements, failed to investigate the veracity of those statements, conducted their investigation on a whim, and conducted their investigation in such a manner as to falsely lead the investigation to Plaintiff in an effort to conclude the investigation, including, but not limited to the following:

        1.)    Rhonda and Tiffany Duritsky were initially targets of the investigation. When DNA evidence ruled Tiffany Duritsky out as the biological mother of Baby Mary, Defendants focused their investigation on her sister, Rhonda Duritsky;

        2.)    Based on the irrelevant and unreliable knowledge that Timothy Reckner was a user of drugs and previously lived in the town where Baby Mary was found, Defendants interviewed Mr. Reckner at the Fayette County Prison;

        3.)    As Defendants had hoped and/or encouraged, Mr. Reckner implicated Rhonda Duritsky and Plaintiff in the death of Baby Mary approximately eight years after Baby Mary's death. Further, in an extraordinarily biased identification method, he was shown photographs of only Rhonda Duritsky and Plaintiff, and used those photographs to identify them as the individuals involved in Baby Mary's death;

10

4.)     On that same day, Defendants interviewed two other inmates, Robert Williams and Matthew Fabian, both of whom implicated Timothy Reckner in the death of Baby Mary. Defendants disregarded that information and did not even create a written report of the interviews;

5.)     These Defendants never attempted to verify the information contained in Mr. Reckner's statement, including failing to ever interview Rhonda Duritsky. It was ultimately learned at Plaintiff's criminal trial that Ms. Duritsky had never met Mr. Reckner, had never met Plaintiff, had never attended the location Mr. Reckner refers to in his statement, and in fact had never entered Pennsylvania during 1999-2000, when the alleged conversation took place;

6.)     When Defendants learned, through DNA testing of Tiffany Duritsky, that Rhonda Duritsky was not the biological mother of Baby Mary, they returned to the Fayette County Prison to inform Mr. Reckner of this information and allow him to change his story;

7.)     At that point, Mr. Reckner had no information relevant to the Baby Mary investigation, and had previously demonstrated his unreliability and motive to lie, yet these Defendants continued with investigating Plaintiff based on Mr. Reckner's false information;

8.)     Ultimately, Sarah Sue Hawk was determined to be the biological mother of Baby Mary and was arrested and interviewed. Ms. Hawk stated that she was by herself when she gave birth and disposed of Baby Mary;

9.)     After discussions between these Defendants and Ms. Hawk's counsel, Ms. Hawk gave another statement that implicated Plaintiff in the death of Baby Mary. However, Ms. Hawk denied having any sexual involvement with Plaintiff;

10.)    These Defendants created a false motive for Plaintiff to be involved in the death of Baby Mary, namely that he feared he may be the father of the child;

11.)    These Defendants re-interviewed Ms. Hawk, for the third time, and at that time she signed off on a written statement in which she stated Plaintiff and her had previous sexual relations and Plaintiff was concerned that he may be the father;

11

12.)    This information was in direct contradiction to her prior statements in which she denied ever being sexually involved with Plaintiff, acknowledged that she was aware Hyson Ford was the biological father, and acknowledged informing Hyson Ford and her best friend, Jennifer Lynn Riggin, that Hyson Ford was the father;

13.)    These Defendants knew or should have known that the statement of Ms. Hawk was unreliable and that Plaintiff had no motive to be involved in the death of Baby Mary as Ms. Hawk knew the biological father was Hyson Ford.

e.    These Defendants repeatedly and maliciously ignored evidence exculpating Plaintiff, including evidence that Mr. Reckner himself was involved in the death of Baby Mary.

56.    As a direct and proximate result of the aforesaid actions and/or inactions of Defendants, Plaintiff served nearly nineteen (19) months in prison where he was subjected to severe deprivation of his privacy and liberty interests, cruel and unusual punishment, and substantial physical and emotional pain and suffering.

57.    Plaintiff suffered a loss of job training, employment, and wages during his incarceration and will continue to suffer economic deprivations in the future as a result of his incarceration.

58.    Plaintiff has suffered and will continue to suffer severe mental and psychological stress as a result of being falsely and maliciously prosecuted and imprisoned for crimes he did not commit.

59.    Plaintiff's reputation has been irreparably damaged as a result of the wrongful and malicious prosecution and imprisonment.

60.    A jury trial is demanded as permitted by law.

WHEREFORE, for all of the above reasons, Plaintiff, Warren E. Bircher, Sr., demands judgment against the Defendants, jointly and separately, in an amount together with punitive

12

damages in excess of Seventy Five Thousand Dollars, ($75,000.00), attorneys' fees, costs of suit and all other relief this Court deems appropriate and necessary.

RR0031

Respectfully submitted,

LAW OFFICES OF JOEL SANSONE

/s/Joel S. Sansone
Joel S. Sansone, Esquire
PA ID No. 41008
Attorney for the Plaintiff
Suite 1700, Three Gateway Center
401 Liberty Avenue
Pittsburgh, Pennsylvania 15222
(412) 281-9194


WAYMAN, IRVIN & McAULEY, LLC

Jonathan M. Gesk, Esquire
PA ID No. 205678
Mark J. Gesk, Esquire
PA ID No. 26392
Attorney for Plaintiff
Suite 1700, Three Gateway Center
401 Liberty Avenue
Pittsburgh, PA 15222
(412) 566-2970


Dated: April 20, 2012

14

CERTIFICATE OF SERVICE

This hereby certifies that on the 2nd day of September, 2014, a true and

correct copy of the foregoing documents, Brief for Appellant and Appendix,

Volume I, were served upon the following by ECF transmission which service

satisfies the requirements of F.R.A.P. 25.

Kemal A. Mericli, Esquire
Office of Attorney General
564 Forbes Avenue, 6th Floor
Manor Building
Pittsburgh, Pennsylvania 15219

      In addition, seven copies were also sent by first-class mail to the office of

the Clerk of the United States Court of Appeals for the Third Circuit in

Philadelphia, Pennsylvania.

                              /s/ Joel S. Sansone
                              Joel S. Sansone, Esquire
                              PA ID No. 41008
                              Attorney for the Plaintiff
                              Suite 1700, Three Gateway Center
                              401 Liberty Avenue
                              Pittsburgh, Pennsylvania 15222
                              (412) 281-9194